Filed 7/18/25  P. v. Munguia CA2/3

## NOT TO BE PUBL ISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B331660 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA262173) |
| v. | |
| RAMIRO MUNGUIA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald Coen, Judge.  Affirmed.

Ramiro Munguia, in pro. per.; and Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

————————

In 2005, a jury convicted Ramiro Munguia of first degree murder with true findings on special circumstance allegations that the murder was committed during an attempted robbery and attempted burglary. Thereafter, Munguia petitioned for resentencing under Penal Code section 1172.6.[1] After an evidentiary hearing under that section, the trial court denied the petition, finding that Munguia was a major participant in the felonies who acted with reckless indifference to human life. Munguia appeals from the order denying his petition. His appellate counsel filed a brief under *People v. Delgadillo* (2022) 14 Cal.5th 216, and Munguia filed a supplemental brief. We affirm the order denying Munguia's petition.

## BACKGROUND

I.    Evidence at Munguia's underlying trial

Munguia participated in an attempted robbery and attempted burglary during which Pedro Garcia, Sr., was shot and killed and his son Pedro Garcia, Jr.[2] was also shot but survived. Luis Henriquez, Adrian de la Cruz, and Alex Lopez were Munguia's accomplices. Munguia and Henriquez were jointly tried before a jury. Adrian and Alex entered into plea agreements and testified at Munguia and Henriquez's joint trial.

---

[1]    All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[2]    To avoid confusion, we refer to most witnesses and participants by their first names.

In February 2004, Pedro Sr. lived in a house with his wife and adult son David Garcia. Pedro Sr.'s other son, Pedro Jr., lived in a house at the back of the property with his wife and two children. Pedro Sr. sold drugs from the house.

On the evening of February 19, 2004, at about 5:00 p.m., a group of people discussed robbing Pedro Sr. Alex and Alfonso Lopez (brothers) were at their house with Munguia, Adrian and Jaime de la Cruz (brothers), and Sammy Navarez. According to Alex, who testified at trial, Sammy told them about a house with "kilos or some money" that "we could go and break in the house, do a robbery." Sammy had bought drugs from there before, and said two older people lived in the house.

The group discussed how they could gain entry to the house. Adrian came up with an idea about pretending to sell flowers to get into the house. Alex did not want to go into the house because he lived in the neighborhood and might be recognized, but agreed he and Adrian could be lookouts. Munguia said he had a friend, Henriquez, who could help them, and he called Henriquez and asked him to come to Alex's house. When Henriquez arrived, they planned for him to go into Pedro Sr.'s house first, and Munguia would follow him. Adrian's sister, Lidia de la Cruz, agreed to be a getaway driver.

Before executing the plan, some of the men drove by Pedro Sr.'s house to scope it out. According to Alex, he, Adrian, and Sammy drove by Pedro Sr.'s house, and they did not see anybody there. According to Adrian, he, Jaime, Munguia, and Alex drove by the house. In any event, they returned to Alex's house where Sammy gave two semiautomatic guns, a nine millimeter and a .40 caliber, to Munguia, who gave one to Henriquez.

3

The group left in two cars: Henriquez drove himself and Jaime in Henriquez's red car, and Lidia drove Adrian, Munguia, and Alex in her black SUV.[3] Lidia parked about five houses down from Pedro Sr.'s house.

At 6:30 p.m., David, Pedro Sr.'s son, returned home from work. He noticed a red station wagon driving down the street. He also noticed two men standing outside a black SUV. At 7:30 p.m., David left the house. As David exited the front door, a young man whom David identified at trial as Henriquez approached him. Henriquez had a box of flowers and said he was selling them to raise funds for a friend who had died. David bought some flowers for $5. Henriquez asked if anyone in the house might be interested in buying flowers, but David told him nobody was home, although David's mother and father were inside. Henrizquez "kept insisting," but David repeated that nobody was home. As David drove away, he saw Henriquez approach a guy standing next to the black SUV, and David could see two more people inside the SUV. Thirty minutes later, David received a phone call, returned home, and saw crime scene tape around the house.

According to Alex, after Henriquez sold flowers to David, Henriquez and the others returned to Alex's house. Henriquez reported that he could not get into Pedro's Sr.'s house, and there were too many people inside. The group discussed how to get inside the house, and they came up with an idea that Henriquez

---

[3]     Sammy helped plan the crimes, but his involvement thereafter is unclear.

4

would return and say he had change for the flowers.[4]  The group returned to the house in two cars.

At about 8:00 p.m., Pedro Jr. went to the main house, where his mother, father, and one-year-old son were.  Pedro Sr. was talking to Henriquez, who had a box of flowers, at the front door.  Pedro Jr. joined his father at the front door and told Henriquez they were not interested.  However, Henriquez was insistent about showing them the flowers and did not want to leave.  Somehow the security door opened, and Henriquez took out a gun and forced his way into the house.  Pedro Jr. grabbed the gun and forced Henriquez back onto the front porch.  Pedro Jr. then heard gunfire, but he could not tell where it was coming from.  He and Henriquez struggled over the gun, and they fell along the driveway.  Henriquez bit Pedro Jr.'s wrist and arm.  Pedro Jr. rammed Henriquez into a van parked in the driveway, and they fell to the ground.  The next thing Pedro Jr. saw was a person "come up and shoot" two to three times, but Pedro Jr. could not tell where the shots were aimed or where they were coming from.  When the man pointed the gun at Pedro Jr.'s face, Pedro Jr. pleaded, " 'Please don't kill me, I have two babies.' "  The man hit Pedro Jr. twice on the head with a handgun.  Pedro Jr. tried to get up, but the man struck him again and then fled.  Pedro Jr. saw a black SUV leave.  Pedro Jr. had been shot twice in his left leg.  At trial, Pedro Jr. identified Munguia as the man who had fired a gun in his direction.  Pedro Jr. could not tell if Henriquez ever fired his gun.

---

[4]    Adrian testified that he did not want to return to the house because he had not expected that a younger man, David, would be there.  But they all decided to return.  Jaime, however, left and did not go back with them.

Alex testified that during the events, Munguia was waiting nearby, and he saw Munguia shooting from the driveway towards the house. Alex saw Munguia pistol-whip Pedro Jr. in the face, but he did not see Munguia shoot Pedro Jr.

Adrian testified that he saw Munguia fire a gun numerous times towards the house as Henriquez and Pedro Jr. fought. He also saw Munguia pistol-whip Pedro Jr.

When the group returned to Alex's house, there was a discussion that it should not have happened like it did. However, Munguia said, " 'I had to do what I got to do.' " They then learned that Henriquez had been shot in the leg, but they did not know how it happened. A couple of days after the shooting, Alex learned that Pedro Sr. was dead, having been shot twice.

Munguia told Adrian after the shooting that it was not supposed to happen and that he hit Pedro Jr. with his gun to help Henriquez. Adrian told detectives that Munguia said he ran out of bullets and that's why he hit Pedro Jr. with the gun.

After Alex and Munguia were arrested, they were on a transport together to go to a hearing. Munguia said he had heard Alex and Adrian were snitching and, " 'You know what happen when you snitch.' "

Law enforcement recovered seven bullets and five fired cartridge cases from the scene. Two cartridge cases were .40 Smith and Wesson, and three cartridge cases were nine millimeter Luger. The .40 Smith and Wesson cartridge cases were fired from one gun. The nine-millimeter Luger cartridge

cases were fired from a second gun.  Thus, this evidence suggested that two guns were used during the incident.[5]

Henriquez testified in his defense that he had no part in planning or committing a robbery or burglary.  Instead, at the request of his good friend Munguia, he was at Pedro Sr.'s to buy cocaine.  Munguia gave him the flowers so that neighbors would not get suspicious.  When Pedro Sr. shorted him on the cocaine, Pedro Jr. refused to give Henriquez his money back and pulled out a gun.  Henriquez and Pedro Jr. struggled over the gun.  During the struggle, Henriquez heard gunshots, but he never saw Munguia pistol-whip Pedro Jr. or fire a gun, and Henriquez did not have a gun other than the one he wrested from Pedro Jr.  Henriquez saw Munguia only when they were getting into the SUV to leave.

II.    Verdict and sentence

A jury convicted Munguia of first degree murder with special circumstance findings that he committed the murder during an attempted robbery and an attempted burglary (§§ 187, subd. (a), 190.2, subd. (a)(17)(A) & (G); count 1), first degree attempted residential robbery of Pedro Sr. in concert (§§ 664, 211, 213, subd. (a)(1); count 3), and first degree attempted burglary with a person present (§§ 459, 664, 667.5, subd. (c)(21); count 5), with findings as to each offense that a principal was armed with a firearm (§ 12022, subd. (a)(1)).  As to all counts, the jury found not true a personal gun use allegation under section 12022.53, subdivision (d), and deadlocked on personal gun use allegations under subdivisions (b) and (c) of that section.  The jury acquitted

---

[5]     Other ballistics evidence could not exclude the possibility a third gun was used.

7

Munguia of count 6 for shooting at an occupied dwelling (§ 246) and deadlocked on count 2 for the attempted premeditated murder of Pedro Jr. and count 4 for attempted residential robbery in concert involving Pedro Jr.  Counts 2 and 4 were dismissed.

Jurors were unable to reach a verdict as to Henriquez, and the trial court declared a mistrial as to all counts as to him.

In 2007, a court sentenced Munguia to life without parole on count 1 plus one year for the gun use enhancement (§ 12022, subd. (a)(1)).  On count 3, the court sentenced Munguia to the midterm of three years plus one year for the gun enhancement and, on count 5, to the midterm of two years plus one year for the gun enhancement.  The court stayed the sentences on counts 3 and 5 (§ 654.)

III.    Section 1172.6 petitions and evidentiary hearing

Munguia filed multiple successive section 1172.6 petitions that were denied and are not relevant to this appeal.  He filed the at-issue petition in April 2022, and the trial court appointed counsel for him.  The People conceded that Munguia established a prima facie case for relief because he was prosecuted under the felony murder doctrine.  The trial court therefore issued an order to show cause, received briefing, and held an evidentiary hearing.

At the June 1, 2023 evidentiary hearing, the trial court said it had read and considered the petition, the People's concession to the issuance of an order to show cause, the written briefs, the preliminary hearing transcript, the clerk's transcript, and the partial reporter's transcript submitted via CD.  The trial court considered the appellate opinion affirming Munguia's judgment of conviction for procedural history only.  The parties offered no new or additional evidence.

The People argued that Munguia was guilty of first degree murder either as a direct aider and abettor or under the felony murder doctrine. Further, because the jury hung on the section 12022.53, subdivision (b) and (c), personal gun use allegations instead of acquitting Munguia of them, the People argued that the trial court could consider evidence that Munguia hit Pedro Jr. with the gun and shot him. Accordingly, the evidence showed that Munguia planned the burglary and robbery, shared any intent to kill, and was a major participant in the felonies who acted with reckless indifference to human life.

In response, Munguia's counsel pointed out that lethal force was not part of the plan, others planned the burglary and robbery and supplied guns, and they did not expect resistance from the elderly residents. Also, the jury acquitted Munguia of shooting at an inhabited dwelling.

In ruling, the trial court noted that Munguia admitted he pistol-whipped Pedro Jr. and said, " 'I had to do what I got to do.' " Under the relevant factors, the trial court found beyond a reasonable doubt that Munguia was a major participant in the felonies who acted with reckless indifference to human life and was also a direct aider and abettor who acted with intent to kill. Accordingly, the trial court denied Munguia's petition.

IV.    This appeal

Munguia appealed, his appellate counsel filed a *Delgadillo* brief, and Munguia filed a supplemental brief. Munguia's supplemental brief repeated that there was insufficient evidence he had intent to kill. Further, he was acquitted of the section 12022.53, subdivision (d) allegation and of shooting at an inhabited dwelling, and therefore he was not the actual killer.

9

# DISCUSSION

I.    Senate Bill No. 1437 and standard of review

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) and subsequent related legislation limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime.  (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).)

Senate Bill 1437 added section 188, subdivision (a)(3), which provides that "to be convicted of murder, a principal in a crime shall act with malice aforethought" and malice "shall not be imputed to a person based solely on his or her participation in a crime."  Senate Bill 1437 also amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person (1) was the actual killer, (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor, or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d).  (*Gentile*, *supra*, 10 Cal.5th at p. 842.)

Senate Bill 1437 created a procedure, codified at section 1172.6, for a person convicted of murder under the former law to be resentenced if the person could no longer be convicted of those crimes under current law.  (*People v. Lewis*, *supra*, 11 Cal.5th at p. 959; *Gentile*, *supra*, 10 Cal.5th at p. 847.)  A defendant

10

commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder under current law. (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence and the trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

A trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing are reviewed for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

II.     Munguia was a major participant in felonies who acted with reckless indifference to human life

The trial court found that Munguia was a major participant in felonies who acted with reckless indifference to human life under current law. After setting forth the applicable law, we discuss the sufficiency of the evidence to support the trial court's order.

A.     Banks *and* Clark *factors*

*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), identified factors to consider when determining whether someone was a major participant in a felony who acted with reckless indifference to human life. To determine "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant," a court

11

should consider, "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, at pp. 794, 803, fn. omitted.)

Reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at p. 617.) Subjectively, the defendant must consciously disregard risks known to him. (*Ibid.*) Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,'" that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*) Factors to consider when determining reckless indifference are: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What

12

efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

In evaluating the sufficiency of evidence to support a trial court's finding that these *Banks/Clark* factors are established, no one factor " 'is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.) Rather, we evaluate the factors under the totality of the circumstances to determine a petitioner's place on the culpability spectrum. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 675.)

### B. *Major participant*

Substantial evidence supported the trial court's finding that Munguia was a major participant in the attempted burglary and attempted robbery.

First, Munguia planned the robbery and burglary with his accomplices: he planned to enter the house and, inferentially, to restrain the occupants after Henriquez gained entry, revised the plan after Henriquez sold the flowers but failed to gain entry into the house, and came to Henriquez's aid when Pedro Jr. tried to defend Pedro Sr. Although Munguia may not have supplied the guns, the plan included Munguia and Henriquez arming themselves with guns, entering Pedro Sr.'s house, and, it is reasonable to infer, restraining the occupants at gunpoint. As it turned out, both men used their guns: Henriquez pointed his gun at Pedro Sr. and Pedro Jr. and might have discharged it, and Munguia discharged his gun and hit Pedro Jr. with it.

Second, the nature of the crimes, a burglary and robbery of a known drug dealer at his home, was a dangerous one. Although Munguia might have thought that the residents were elderly and would not put up resistance, the reasonableness of

13

his belief is questionable. Instead, it was foreseeable that a drug dealer, even an "elderly" one,[6] might be armed and would resist burglary and robbery attempts. (See, e.g., *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant acted with reckless indifference when "he cooked up a plan to break into the home of a known drug dealer while they were home and to use force, including firearms, to steal the dealer's product," pushed his way into the home, and used his gun to threaten residents and pin them down].) Moreover, once Henriquez encountered David, he and the others knew that younger people, and not just elderly people, were at the house. Thus, the nature of the crime posed extreme danger.

Third, Munguia was at the scene of Pedro Sr.'s murder and played a significant role in his death. When Munguia saw that Pedro Jr. came to his father's aid and was fighting with Henriquez, Munguia did not try to stop the fight. Instead, he joined it, fired his gun, and pistol-whipped Pedro Jr. His actions therefore contributed to the shooting of Pedro Sr. and his son.

Finally, after Pedro Sr. and Pedro Jr. were shot, Munguia fled the scene. Although it is unclear at what point Pedro Sr. was shot, it is reasonable to infer he was shot while Henriquez and Pedro Jr. were fighting. Instead of helping Pedro Sr., Munguia helped his accomplice. This factor therefore also supports the trial court's finding that Munguia was a major participant in the felonies.

Based on the totality of the above factors, the record contains substantial evidence supporting the trial court's finding that Munguia was a major participant in the attempted felonies.

---

[6] Pedro Sr. was only 61 years old at the time of his death.

14

C. *Reckless indifference to human life*

Substantial evidence also supports the trial court's conclusion that Munguia acted with reckless indifference to human life.

First, Munguia and Henriquez armed themselves with guns and planned to use them. While the mere fact a robbery involved a gun is insufficient by itself to support a finding of reckless indifference to human life, the presence of two lethal weapons is nonetheless relevant to the required mens rea and weighs in favor of the trial court's reckless indifference finding, even if it is not dispositive. (See generally *In re Scoggins*, *supra*, 9 Cal.5th at p. 682 [anyone who plans or participates in armed robbery anticipates lethal violence might be used, given that one in 200 armed robberies results in death, even though that alone does not establish reckless indifference to human life]; *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 [personally wielding gun during robbery reflects reckless indifference to human life].)

Second, Munguia was at the crime scene and had the opportunity to restrain the crime. (See, e.g., *People v. Mitchell* (2022) 81 Cal.App.5th 575, 592 [reckless indifference found where defendant was present at every stage of crime: "planning, execution, dividing the spoils, and flight"].) When a fight broke out between Pedro Jr. and Henriquez, Munguia could have yelled at Henriquez to desist, or Munguia could even have left, thereby evidencing a disavowal of further violence. (See, e.g., *People v. Emanuel* (2025) 17 Cal.5th 867, 891 [when victim resisted, defendant said, "let's go," evidencing intent to abandon plan rather than resort to greater violence].) Instead, Munguia violently entered the fray by pistol-whipping Pedro Jr. and firing

15

his gun.[7]  Even if Munguia did not shoot anyone, the mere act of firing his gun multiple times was a violent act that exhibited a reckless indifference to human life.  Indeed, after the shooting, Munguia said, "I did what I got to do."  This statement shows that Munguia did not care if someone was killed as a result of his actions, and it therefore supports the reckless indifference finding.

Third, the crime was of prolonged duration, and there was a greater opportunity for violence because there was an attempt to restrain victims.  (See generally *Clark*, *supra*, 63 Cal.4th at p. 620.)  The robbers cased the house before putting their plan into action.  Henriquez sold the flowers to David but failed to gain entry to the house.  During that time, the robbers saw David come and go from the house, and, it is reasonable to infer, could have seen other activity at the house showing it was occupied.  Instead of abandoning the plan, Munguia and his accomplices restrategized and returned to the house.  Henriquez pulled out

---

[7]  Although the trial court could not find that Munguia was the actual killer based on the jury's not true finding on the section 12022.53, subdivision (d), allegation and acquittal of the count for shooting at an inhabited dwelling, the trial court could find that Munguia used his gun because the jury hung, but did not acquit, on the section 12022.53, subdivisions (b) and (c), allegations.  (Compare *People v. Wilson* (2023) 90 Cal.App.5th 903, 905 [jury's inability to reach verdict on personal use and discharge of firearm allegation did not preclude trial court from finding prosecution proved beyond a reasonable doubt defendant was actual killer at § 1172.6 evidentiary hearing], with *People v. Arnold* (2023) 93 Cal.App.5th 376 [jury's not true finding on personal knife use allegation precluded court at § 1172.6 evidentiary hearing from finding defendant was actual killer].)

16

his gun, inferentially to restrain the residents.  Henriquez then fought with Pedro Jr.  Munguia joined the fight and disabled Pedro Jr. by hitting him with and firing his gun.

Fourth, there is no clear evidence Munguia knew about any propensity for violence Henriquez had.[8]  (See generally *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025 [finding " 'significant' " lack of evidence petitioner knew of his confederates' "violent propensities"].)  However, when Munguia and his accomplices were planning the burglary, and nobody wanted to be the one to enter the house, Munguia said his friend Henriquez would do it.  This suggests that Munguia knew Henriquez had *some* criminal propensity and was willing to use a gun.  While the evidence does not clearly show that Munguia knew Henriquez had violent tendencies, it suggests Munguia knew Henriquez would readily use a gun.  This factor is therefore neutral or does not weigh in favor of a reckless indifference finding.

Fifth, although there was evidence that the plot did not include using lethal violence, the burglary was planned in a manner that heightened, rather than minimized, the risk of violence.  Munguia planned to rob a known drug dealer.  (See, e.g., *People v. Bascomb*, *supra*, 55 Cal.App.5th at p. 1089 [plan to forcibly rob known drug dealer exhibited reckless indifference to human life].)  The plan was to burglarize the house at night, when they knew people would be present.  (Compare *People v. Owens* (2022) 78 Cal.App.5th 1015, 1024 [bank robbery posed high risk of violence because it occurred during business hours

---

[8] Henriquez had participated in a prior attempted robbery during which he pointed a gun at the victim, choked the victim, and threatened to kill him and his family.  However, there was no evidence that Munguia knew about this prior incident.

with 20 people present and robbers were armed], with *People v. Emanuel, supra*, 17 Cal.5th at p. 887 [defendant minimized risk of violence where crime occurred at 3:00 p.m. on residential street adjacent to a park where witnesses might be present to observe, and robbery plan did not include using weapons]; *Clark, supra*, 63 Cal.4th at pp. 621–622 [plan to rob closed store minimized risk of violence].)  After Henriquez encountered David, Munguia did not abandon the plan, but instead he regrouped with the others, revised the plan, and returned to the house.  Indeed, they returned to the house even though Henriquez said he did not go in the first time because there were too many people there. Therefore, Munguia knew that there were people in the house. Thus, inferentially, the revised plan must have included dealing with the residents.

Finally, there is no evidence Munguia tried to help Pedro Sr. or Pedro Jr.  Instead, Munguia pistol-whipped Pedro Jr., thereby disabling and preventing Pedro Jr. from helping his father.  (Compare with *People v. Emanuel, supra*, 17 Cal.5th at p. 894 [defendant took no action to interfere with victim's ability to receive aid].)  Such callous behavior supports the reckless indifference finding.  (See, e.g., *People v. Montanez* (2023) 91 Cal.App.5th 245, 280 [defendant was just 50 yards from crime scene when he heard gunshot and had reason to suspect his accomplice shot the victim, "yet he did not turn back to see if any of them was wounded or in need of aid"]; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to aid or comfort victim].)

Substantial evidence supports the trial court's reckless indifference finding.

In conclusion, the totality of the *Banks*/*Clark* factors supports the trial court's finding that Munguia was a major participant in the felonies who acted with reckless indifference to human life under current law.[9]

## DISPOSITION

The order denying Ramiro Munguia's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:


ADAMS, J.                          HANASONO, J.

---

[9]  Because we so conclude, it is unnecessary to address the trial court's alternative finding that Munguia was a direct aider and abettor who acted with intent to kill.

19